BRETT L. TOLMAN, United States Attorney (#8821)
DUSTIN B. PEAD, Assistant United States Attorney (#8251)
BARBARA BEARNSON, Assistant United States Attorney (#3986)
Attorneys for the United States of America
185 South State Street, #300
Salt Lake City, Utah 84111
Telephone: 801-524-5682
Facsimile: 801-524-4475

FILED
U.S. DISTRICT COURT
2007 FEB 28 P 4: 25

---

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, NORTHERN DIVISION

---

| | |
|---|---|
| | SEALED INDICTMENT |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FOCUS ON CHILDREN, SCOTT BANKS, KAREN BANKS, DAN WAKEFIELD, TAGALOA IETI, COLEEN BARTLETT, JULIE TUILETUFUGA and KARALEE THORNOCK,<br><br>Defendants. | VIO: 18 U.S.C. § 371 (Conspiracy to Commit Alien Smuggling and Visa Fraud)<br><br>18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering)<br><br>8 U.S.C. § 1324(a)(2); 18 U.S.C. § 2 (Bringing In Illegal Aliens to the United States; Aiding and Abetting)<br><br>8 U.S.C. § 1324(a)(1)(A)(iv), (v)(II) (Encouraging or Inducing Illegal Aliens to Come to, Enter, or Reside in the United States; Aiding and Abetting)<br><br>18 U.S.C. § 1546(a); 18 U.S.C. § 2 (Fraud and Misuse of Visas; Aiding and Abetting)<br><br>18 U.S.C. § 1956(a)(2)(A); 18 U.S.C. § 2 (Laundering of Monetary Instruments; Aiding and Abetting)<br><br>18 U.S.C. § 1957; 18 U.S.C. § 2 (Monetary Transactions in Property Derived from |

Judge David Sam
DECK TYPE: Criminal
DATE STAMP: 02/28/2007 @ 13:16:27
CASE NUMBER: 1:07CR00019 DS

: Specified Unlawful Activity; Aiding and Abetting)

: Notice of Intent to Seek Forfeiture pursuant to 18 U.S.C. § 982(a)(6), 8 U.S.C. § 1324(b) and 28 U.S.C. § 2461

---

The Grand Jury charges:

**INTRODUCTION**

The Adoption and Immigration of Foreign-Born Children Generally

1. Under the immigration laws of the United States, a qualified United States citizen ("petitioner") may seek lawful immigrant status for an adopted foreign-born child ("beneficiary") by applying for and obtaining an immigrant visa. A validly issued immigrant visa permits the beneficiary child to lawfully come to, enter, and reside in the United States.

2. To begin the process, a petitioner files Form I-600A (Application for Advance Processing of Orphan Petition) with the office of U.S. Citizenship and Immigration Services having jurisdiction over his or her residence in the United States. In conjunction with this form, the petitioner must submit, among other things, evidence of United States citizenship, fingerprints, proof of compliance with preadoption requirements of the state of the child's proposed residence if any, and a favorably recommended home study.

3. After approval of the I-600A and successful adoption of the child under

the laws of the foreign country, the petitioner may file a Form I-600 (Petition to Classify Orphan as an Immediate Relative) at the appropriate United States Embassy or Consulate abroad. The petitioner must submit proof of the child's age and identity and must demonstrate to State Department officials that the child is an "orphan" as defined by United States immigration law and regulation.

4. Under United States immigration law, an "orphan" is defined as (A) a child who has been abandoned or deserted by, or separated or lost from, both parents or for whom both parents have disappeared or died or (B) whose sole or surviving parent cannot give him or her proper care and has, in writing, irrevocably released the child for adoption.

5. Under United States immigration law, "abandonment" means that the parents have willfully forsaken all parental rights, obligations, and claims to the child, as well as all control over and possession of the child, without intending to transfer, or without transferring, these rights to any specific person(s). Abandonment includes not only the intention to surrender all parental rights, obligations, and claims to the child, and control over and possession of the child, but also the actual surrendering of such rights, obligations, claims, control and possession. A relinquishment or release by the birth parents to the prospective adoptive parents or for a specific adoption does not constitute abandonment. Similarly, the relinquishment or release of the child by the parents to a third party for custodial care in anticipation of, or preparation for, adoption does not

constitute abandonment unless the third party (such as a governmental agency, a court of competent jurisdiction, or an adoption agency or orphanage) is authorized under the child welfare laws of the foreign country to act in such a capacity. A child who is placed temporarily in an orphanage is not considered abandoned if the parents express an intention to retrieve the child, are contributing or attempting to contribute to the support of the child, or otherwise exhibit an ongoing parental interest in the child. A child who has been given unconditionally to an orphanage is considered abandoned.

6. In conjunction with the I-600, the petitioner must submit evidence verifying that he or she saw the child prior to or during the adoption proceeding. If such did not occur, proof must be submitted showing that the prospective adoptive parent(s), or a person or entity working on their behalf, has secured custody of the child in accordance with the laws of the foreign country.

7. Once the I-600 is approved by State Department officials, the child is an "immediate family relative" of a United States citizen and, consequently, is eligible for an immigrant visa. Generally speaking, when such a child enters the United States, he or she immediately becomes a United States citizen.

Customary Adoption in Samoa

8. Traditionally speaking, adoption in Samoa is a practice which does not involve any formal or legal proceeding. In practice, Samoan citizens routinely consent to the "adoption" of their children to relatives living in other parts of

Samoa or abroad, such as New Zealand. This is because in Samoan culture all children are part of a large, extended family and it may be beneficial or prudent to send the child to live with others for any number of reasons for varying lengths of time.

9. This customary practice does not involve any formal severance of parental rights, is commonly agreed upon with an oral declaration alone, and does not require the approval of any court or government official. Significantly, even though such "adoption" has occurred, the birth parents communicate with the child, often visit the child, and continue to maintain a customary claim to the child, including the expectation that the child will return to them after he or she attains adulthood to help take care of them as they age. Furthermore, children "adopted" pursuant to custom retain inheritance rights from their birth parents.

**COUNT 1**
**18 U.S.C. § 371**
**(Conspiracy to Commit Alien Smuggling and Visa Fraud)**

10. The Grand Jury adopts, realleges, and incorporates herein the allegations in paragraphs 1 - 9 of the Introduction of this Indictment as if set out fully herein.

11. Beginning on a date unknown to the Grand Jury, but no later than March 2002 and continuing through on or about June 2005, in the District of Utah and elsewhere,

FOCUS ON CHILDREN, SCOTT BANKS, KAREN BANKS,

DAN WAKEFIELD, TAGALOA IETI, JULIE TUILETUFUGA,
COLEEN BARTLETT and KARALEE THORNOCK,

the defendants herein, and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to:

(A) encourage and induce Samoan [1] children to come to, enter, and reside in the United States, knowing and in reckless disregard that such coming to, entry, and residence was or would be in violation of law, all in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv);

(B) bring to and attempt to bring to the United States Samoan children, knowing and in reckless disregard that such coming to, entry, and residence is or will be in violation of law, for the purpose of commercial advantage and private financial gain, all in violation of Title 8, United States Code, Section 1324(a)(2); and

(C) knowingly cause others to make under oath and under penalty of perjury, subscribe as true, and present an application containing a false and fraudulent statement with respect to a material fact on United States Citizenship and Immigration Services Form I-600 (Petition to Classify Orphan as an Immediate Relative) for the purpose of permitting another to come to, enter, and reside in the United States as an orphan child of a United States citizen, in that in such petition the defendants caused to be stated that the children listed in such applications were bona fide orphans when, in truth and fact, such was not true, all in violation of Title 18, United States Code, Section 1546(a).

---

[1] Samoa, formerly known as Western Samoa, became an independent country in 1962. Citizens of Samoa are not citizens or nationals of the United States and must seek and obtain permission from U.S. officials prior to coming to, entering, or residing in the United States. By contrast, American Samoa is a territory of the United States and its residents are nationals of the United States who may freely travel to and work in the United States without first obtaining permission from U.S. government officials.

## OBJECT OF THE CONSPIRACY

12. It was the object of the conspiracy for the defendants to make money by taking Samoan children away from birth parents using false promises and deceit, to falsely claim to prospective adoptive parents in the United States that such children had no one to take care of them and had been abandoned, and to fraudulently cause unsuspecting adoptive parents to assert to United States Government officials that such children were legitimate orphans when in truth and fact they were not.

## MANNER AND MEANS OF THE CONSPIRACY

13. General Practices of "Focus on Children"

It was a part of the conspiracy that "Focus on Children" (hereinafter referred to as "FOC") charged a fee of several thousand dollars to facilitate the adoption and immigration of foreign-born Samoan children by and through United States citizens. To do so, FOC employed recruiters in Samoa who:

(A) identified, pursued and deceptively persuaded Samoan birth parents and their families to place their children up for international adoption (hereinafter referred to as "the program");

(B) arranged for the care of Samoan children who had been taken from their birth parents and placed in a "nanny home" in Samoa which was paid for by FOC and operated by its employees or representatives. This home was a place where the newly adopted child would be temporarily placed pending his or her delivery to adoptive parents; and

(C) delivered the children to the adoptive parents, either in Samoa or

New Zealand.

FOC also employed United States citizens in Utah and Wyoming who:

(A) referred Samoan children who were not orphans to prospective adoptive parents;

(B) completed or assisted in the completion of the required immigration-related paperwork described above; and

(C) collected fees from adoptive parents.

The owners and operators of FOC in Utah supervised and/or participated in all of the above.

14. Specific Practices of "FOC"

(A) Targeting children for the program

It was a part of the conspiracy that conspirators in Samoa endeavored to identify families that might be persuaded to give up their children for placement in the program. In some cases, employees or associates of FOC did so by surveilling marketplaces or other locations where women frequently gathered. In other cases, women were referred to the conspirators by others who had earlier unwittingly given up their children to FOC based on false promises. Occasionally, some women approached conspirators on their own after hearing about FOC from multiple sources. Finally, some women were identified as potential targets by conspirators who conducted presentations to, or engaged in group discussions with, village leaders.

(B) Persuasion of the birth parents using fraud and deception

It was a further part of the conspiracy that, after targeting specific children for placement in the program, conspirators in Samoa told the birth parents, as well as extended family in many circumstances, some or all of the following false representations or statements in an effort to persuade them to give their children to the program:

> (i) that the program was created by the United States Government or the "Mormon Church" (also known as "The Church of Jesus Christ of Latter-Day Saints") to assist families in Samoa that were struggling financially or desired that their children be educated abroad;
>
> (ii) that their children would be "adopted" by a family in the United States and remain there until the child reaches the age of 18 at which point he or she would return to Samoa;
>
> (iii) that they (the birth family) would receive letters and/or photos from the adoptive family in the United States;
>
> (iv) that they (the birth family) may receive money from either FOC or the adoptive family in the United States until their children returned and could help take care of them;
>
> (v) that the adoptive family would occasionally bring the children back for visits with the birth family; and
>
> (vi) in cases where siblings were being placed in the program, that they would all be adopted by the same family in the United States.

It was a further part of the conspiracy that some birth families considering placing their child or children in the program were given what conspirators called "humanitarian assistance" such as nominal amounts of money, bags of rice or other food items or promises of other items of value. Such

assistance ended once the child was actually delivered to the adoptive parents.

(C) Referral of children who had not yet been relinquished and were not orphans

It was a further part of the conspiracy that once a child was identified for placement in the program, such information was relayed to conspirators in Utah and Wyoming, who then referred the child to a prospective adoptive family or advertised the child on FOC's website. Often, such referrals or advertisements took place even though no relinquishment paperwork had yet been actually completed and the child was, in fact, living with his or her birth parents and was not an orphan. Also, conspirators in Utah and Wyoming often asserted to prospective adoptive families in the United States that the referred child was residing at a nanny home run by FOC when such was not true.

(D) Dishonesty with prospective adoptive parents

It was a further part of the conspiracy that conspirators in the United States frequently fabricated statements regarding the birth family to the prospective adoptive family. These false statements related to, among other things, the circumstances surrounding the child's birth, including whether the child was the result of an affair, the inability to identify or locate the father of the child, the disinterest of the father in the child, and the inability of immediate and extended family to take care of the child. All of these statements had the tendency of persuading prospective adoptive parents that the child's circumstances in Samoa were indeed dire. More significantly, such false statements were used to

persuade prospective adoptive parents that the children were orphans. Finally, at no time were actual or prospective adoptive families told about any of the promises made to birth families by FOC described above.

(E) Obtaining relinquishment and adoption in Samoa by the use of false statements

It was a further part of the conspiracy that conspirators in Samoa and Utah prepared affidavits for signature by the birth parents attesting to the circumstances justifying the relinquishment and/or adoption of the child under Samoan law. Such affidavits were written in English, which the large majority of Samoan birth parents who had given up their child(ren) for adoption in the United States could not read or understand, and were not, as a matter of course, translated and/or read to them in their native language. Also, the affidavits routinely contained false statements crafted to create the impression with those who read it that the circumstances of the birth family were more desperate than they really were. For example, many of the affidavits listed a greater number of children than the family actually had. This was significant because each document signed by birth parents falsely stated that they could not adequately provide for the child. In addition, some affidavits falsely indicated that the identity of the father was not known or that he had expressed no interest in the child.

(F) The continued residence of children with birth families post-relinquishment and/or adoption

It was a further part of the conspiracy that after the relinquishment and/or

adoption many children continued to live with their birth parents even though the paperwork that had just been completed stated that the birth parents were unable to provide for them. In other circumstances, FOC did take custody of the child and placed him or her in a "nanny home." However, in such circumstances, it was common that the birth parents frequently visited the child and, in some cases, took him or her home for extended periods of time. Even in those cases where the child continued to reside with birth parents, adoptive families were routinely required, as part of their fee, to pay for foster care for their child. Of course, the adoptive parents were not aware that the child was not at the nanny home.

(G) Efforts to prevent adoptive parents from discovering the true nature of their adoptive child's residence in Samoa

It was a further part of the conspiracy that conspirators in Utah and Wyoming discouraged some adoptive families from traveling to Samoa to pick up their newly-adopted child or children, many of whom were not living at the nanny home contrary to what adoptive parents had been told. Adoptive families that did travel to Samoa were forbidden to see the nanny home. Moreover, many adoptive parents were told that they were not permitted to visit with the birth parents and that all adoptions in Samoa were required by law to be closed adoptions or that there could be no contact between birth and adoptive parents which was not true. Finally, on those occasions when the adoptive parents did meet with birth parents in Samoa despite FOC's efforts to prevent it, conspirators told adoptive parents

that they should not disclose such meetings to U.S. government officials in New Zealand.

(H) Unaccounted for "donations"

It was a further part of the conspiracy that conspirators in Utah often required that adoptive families make "donations" to the agency for use at the nanny home including toys, clothing, and other items. Despite this requirement, children at the nanny home lacked adequate food and supplies and, on some occasions, were left to be cared for by older children. In some instances, adoptive families voluntarily collected clothing, medical supplies and other items for the nanny home and offered them to FOC officials. However, these offers were repeatedly ignored.

(I) Obtaining U.S. immigrant visas by causing adoptive parents to falsely assert that the adopted children were "orphans"

It was a further part of the conspiracy that conspirators caused adoptive parents to file I-600s on behalf of their adopted children asserting that such children were orphans because they either had no parents or had one parent who was incapable of providing for them which, as stated above, was not true. Adoptive parents did so based on claims and representations made by conspirators in the United States, Samoa, or both.

**OVERT ACTS**

15. During and in furtherance of the conspiracy, within the District of Utah

and elsewhere, one or more of the conspirators committed one or more of the following overt acts:

(A) The Adoption and Immigration of Samoan Children E.F.(1) and E.F.(2).

(1) In March 2002, DAN WAKEFIELD, JULIE TUILETUFUGA and at least one other unindicted coconspirator approached a pregnant Samoan citizen to persuade her to give up her then unborn child to the program. They told her that the program was created by the U.S. Government to help struggling Samoan families, that her child would return home at the age of 18, that she would receive financial assistance once the adoption was completed, and that she would maintain communication with the child in the United States.

(2) On April 22, 2002, DAN WAKEFIELD escorted the birth mother to the hospital to give birth. It was only then that she discovered that she was having twins. While at the hospital, the birth mother expressed a desire to keep one of her children. JULIE TUILETUFUGA told her that doing so might make them ill because they were identical twins. Consequently, she agreed to give both children to FOC.

(3) Following their birth, FOC referred the children to prospective adoptive parents. FOC representatives falsely told the prospective adoptive parents that the birth father was injured and could not work and, consequently, the birth family could not take care of the children.

(4) On May 9, 2002, the birth parents signed a "Confirmation of Relinquishment" for both children at a lawyer's office in Apia, Samoa. The attorney told the birth parents that they would not have any further contact with their children. The birth parents hesitated and told JULIE TUILETUFUGA that they did not understand. JULIE TUILETUFUGA told them that they would in fact see their children again and receive financial assistance.

(5) In August 2002, the adoptive family traveled to Samoa to pick up the children. At the request of FOC, the adoptive family handed over approximately $2,000 in "humanitarian aid" to FOC representatives in Samoa. The children were subsequently delivered to the adoptive parents who took them to New Zealand for U.S. visa processing.

(6) On August 19, 2002, an I-600 which falsely claimed that E.F.(1) and E.F.(2) were orphans was filed by the adoptive parents on behalf of the children. The following day, an immigrant visa was issued to the children who subsequently immigrated to the United States.

(B) The Adoption and Immigration of Samoan Children L.L.(1) and L.L.(2).

(1) In the Spring of 2002 DAN WAKEFIELD visited the birth parents of L.L.(1) and L.L.(2) many times to persuade them to place some of their children in the program, which he described as a United States program to help families with many children. DAN WAKEFIELD told the birth parents that the children would return to Samoa at the age of 18 as well as for a visit approximately every 5 years, that he (DAN WAKEFIELD) would continue to support the family after the adoptions are completed, and that they would maintain communication with their children. DAN WAKEFIELD also told them that the children would be adopted together.

(2) In May 2002, FOC representatives in the United States told the prospective adoptive parents of L.L.(1) that the birth family had 13 children and could not take care of their youngest two. In fact, there were 8 children in the family, all of whom the parents could care for. Further, after the prospective adoptive family of L.L.(1) completed all the necessary paperwork, SCOTT BANKS mentioned for the first time that L.L.(1)'s sister, L.L.(2), was being adopted by a different family. When the prospective adoptive family of L.L.(1) expressed surprise at this, SCOTT BANKS falsely indicated that it was because L.L.(2) had been relinquished at a later date. Similarly, the adoptive parents of L.L.(2) discovered at some point that she had a sister who was being adopted by a different family. When confronted by the adoptive parents on this issue, SCOTT BANKS falsely told them that he did not tell them about L.L.(1) because she had been relinquished at a different time. However, the sisters had in fact been relinquished on the same day.

(3) After signing the relinquishment of L.L.(1) and L.L.(2), the birth parents visited their children at the nanny home approximately 5 times. Following the last visit, the children were permitted by FOC to return to live with the birth parents for about 1 month. During this time, the birth parents discovered that their children had been mistreated and, therefore, they refused to return them to the nanny home. JULIE

TUILETUFUGA threatened to get the police involved and the birth parents reluctantly relented.

(4) L.L.(1) was not promptly delivered to the adoptive parents when they arrived in Samoa to retrieve her. DAN WAKEFIELD told the adoptive parents that the delay was due to paperwork problems and other trivial matters. However, JULIE TUILETUFUGA admitted to the adoptive parents that she had not been delivered because an extended family member had only recently picked both L.L.(1) and L.L.(2) up and taken them from the nanny home. JULIE TUILETUFUGA told the adoptive parents that FOC told her to not disclose what had occurred and to lie as DAN WAKEFIELD had. JULIE TUILETUFUGA told the adoptive family that FOC should not have sent them to Samoa. After 4 days on the island, the birth parents delivered L.L.(1) to the adoptive parents. Together, they traveled to New Zealand for visa processing.

(5) On January 13, 2003, an I-600 which falsely claimed that L.L.(1) was an orphan was filed by the adoptive parents of L.L.(1). The following day, an immigrant visa was issued to L.L.(1), who subsequently immigrated to the United States.

(6) In March 2003, the adoptive parents of L.L.(2) traveled to Samoa where L.L.(2) was delivered to them by FOC employees. On March 17, 2003, in New Zealand, the adoptive parents of L.L.(2) filed an I-600 which falsely claimed that she was an orphan. An immigrant visa was issued that same day and L.L.(2) subsequently immigrated to the United States.

(7) Upon return to the United States, the adoptive parents of L.L.(1) were told by FOC officials that it was forbidden for them to maintain contact with the birth family and that the birth parents would expect them to send money to help support them.

(C) The Adoption and Immigration of Samoan Child J.T.

(1) In September 2002, DAN WAKEFIELD and TAGALOA IETI approached the birth mother of J.T. in an effort to persuade her to place her child in the program, which was described to her as an American program to help struggling Samoan families. DAN WAKEFIELD and TAGALOA IETI told the birth mother that her child

would return to Samoa at the age of 18.

(2) In January 2003, SCOTT BANKS referred J.T. to a prospective adoptive family in the United States. He falsely told them that J.T. was presently residing at the nanny home in Samoa and that the father was not involved in the child's life. However, the child was not at the nanny home and, in fact, had not yet been relinquished to FOC. Further, the birth father, who did not live with the birth mother, had expressly told TAGALOA IETI that he would not consent to the adoption. Moreover, the father personally took care of the child at his home at least 1 week every other month and was with her on other occasions.

(3) On March 26, 2003, approximately two months after J.T. had been referred to a prospective adoptive family, the birth mother of J.T. allegedly executed a relinquishment of the child which stated that the birth father had denied paternity and had not contributed to the welfare of the child. Neither assertion was true. Additionally, the relinquishment asserted that J.T. had been turned over to FOC. In fact, the child never resided at the nanny home and was living with her birth mother at the time of and following the alleged relinquishment. Moreover, the birth mother of J.T. had never seen, let alone signed, such relinquishment and the signature contained thereon was an apparent forgery.

(4) Upon review of the records by the adoptive family, the adoptive parents asked SCOTT BANKS why he had asserted that J.T. had been in the nanny home since January 2003, but the records reflected that she had not been relinquished until March 2003. SCOTT BANKS stated that birth parents come and go from the nanny home and J.T. had been at the nanny home in January 2003 which, as stated above, was not true.

(5) On May 27, 2003, the adoptive family arrived in Samoa. On May 28, 2003, the birth father went to an attorney to prevent the adoption from taking place, but was told that he could not because he was not identified as the father on the birth certificate. However, the adoption order had not yet been formally signed and the birth father could have legally prevented the adoption. Later that day, the adoptive parents learned of the efforts of the birth father to prevent the adoption and told SCOTT BANKS and DAN WAKEFIELD that they would not

proceed with the adoption if the birth father did not desire it. SCOTT BANKS and DAN WAKEFIELD insisted that the father did not want the child and that the argument was only a “power struggle” between the two Samoan families.

(6) On May 30, 2003, the order of adoption was signed. DAN WAKEFIELD was instructed by the attorney employed by FOC to “get [the adoptive family and the child] out of town” as soon as possible. Later that evening, the family was taken to the airport by a police escort organized by DAN WAKEFIELD. The family left Samoa that evening for New Zealand.

(7) On June 6, 2003, in New Zealand, an I-600 which falsely claimed that J.T. was an orphan was filed by the adoptive parents. An immigrant visa was issued that same day and J.T. subsequently immigrated to the United States.

(D) The Adoption and Immigration of Samoan Child S.S.

(1) In February 2003, DAN WAKEFIELD and TAGALOA IETI approached the birth parents of S.S. to persuade them to place her in the program which they said was run by the Mormon Church, or the Church of Jesus Christ of Latter-Day Saints (“LDS”). They told the birth parents that their child would return at the age of 18 and that they would maintain frequent communication with her.

(2) In September 2003, at the prospective adoptive parents’ request, COLEEN BARTLETT and KAREN BANKS emailed them updated photos of S.S. which, they falsely claimed, had been taken at the nanny home. However, S.S. was not living at the nanny home and the photos were of S.S. in front of the home of her birth parents.

(3) On October 29, 2003, the birth parents of S.S. signed a relinquishment written in English which falsely stated that they could not care for S.S. Further, the affidavit falsely claimed that the birth parents did not impose any conditions regarding the religious upbringing of S.S. However, the birth parents permitted her to be placed in the program only because they believed it was operated by the LDS Church and because they were promised that she would be residing with a Mormon family.

(4) In late October 2003, in advance of the signing of the order of adoption, the prospective adoptive parents attempted to arrange travel to Samoa to pick up S.S. who, according to COLEEN BARTLETT, had been in the nanny home for 9 months. COLEEN BARTLETT and KAREN BANKS falsely told the adoptive parents that they could not travel to Samoa because there had been an outbreak of "German Measles" which was delaying the approval of the adoption. While it was true that S.S.'s adoption had not yet been approved, there had been no outbreak of "German Measles" or any other disease that would have prevented them from traveling to Samoa.

(5) On December 12, 2003, the adoption order of S.S. was signed. The adoptive parents were not, however, informed of this until early January. When the adoptive parents again expressed a desire to travel to Samoa to meet with S.S.'s family and visit her at the nanny home, COLEEN BARTLETT told them that travel was not possible because of problems related to a recent hurricane and that they would have to meet S.S. in New Zealand quickly because the U.S. Consulate in Auckland was going to be closed for two months. COLEEN BARTLETT told them that if they did not, they would be charged for additional foster care for S.S. In truth, the hurricane had not disrupted travel to Samoa, the U.S. Consulate in Auckland was not scheduled to be closed, and S.S. had never lived at the nanny home.

(6) Near the end of January 2004, TAGALOA IETI delivered S.S. to the adoptive parents at the Auckland, New Zealand airport. On February 2, 2004, an I-600 which falsely claimed that S.S. was an orphan was filed by the adoptive parents. An immigrant visa was issued that same day and S.S. subsequently immigrated to the United States.

(E) The Adoption and Immigration of Samoan Children K.K. and F.K.

(1) In early or mid-2003, DAN WAKEFIELD and TAGALOA IETI approached the birth parents of K.K. and F.K. to persuade them to place their children in the program. DAN WAKEFIELD told the birth parents that the children would return for a visit when they turned 5 years old and permanently when they reached the age of 18, and that they would receive financial assistance and photos from the adoptive

family.

(2) In July 2003, SCOTT BANKS referred the two children to their adoptive parents. FOC representatives told the adoptive family that the children were currently in foster care and would be moved to a home in Apia to prepare for the adoption. Also, SCOTT BANKS told the family that the children were available for adoption because the birth mother was impoverished and could not care for them who, he stated, were the youngest of 7 children. Later, after the adoptive parents discovered that the children were the only two children in the family, SCOTT BANKS told them that he couldn't keep all of the children straight. Moreover, while SCOTT BANKS told the adoptive parents that the children had been relinquished to FOC in May 2003, such did not actually occur until October 2003. In addition, from July 2003 (the date of the referral of the children) to October 2003 (the actual date of the relinquishment of the children) and beyond, the children actually resided with their birth parents.

(3) The relinquishment, which FOC prepared and caused to be signed by the birth parents, falsely indicated that the family was not able to take care of the children and that the birth mother did not know who the birth father was.

(4) The adoptive family indicated an interest to SCOTT BANKS and KAREN BANKS in traveling to Samoa to pick up their children. However, they were repeatedly discouraged from doing so. In this regard, SCOTT BANKS and KAREN BANKS told them that travel was difficult because of a recent hurricane, they may run into the family members who may have bad feelings about the adoption, and an uncle recently starting asking questions about the children. When hearing such, the adoptive parents openly asked SCOTT BANKS whether the adoption was legal. SCOTT BANKS insisted that it was. Based on SCOTT BANKS's assurances, the adoptive parents decided to go forward with the adoption.

(5) In February 2004, the adoptive family was preparing to pick up the children in New Zealand. SCOTT BANKS told them that if they did not pay the remaining $9,000 owed, he could not guarantee that the children would be waiting for them in New Zealand.

(6) On February 21, 2004, TAGALOA IETI took the children to New

Zealand. On February 24, 2004, the adoptive parents filed on I-600 for K.K. and F.K., which falsely claimed that the children were orphans, and immigrant visas were issued that same day. K.K. and F.K. subsequently immigrated to the United States.

(F) The Adoption and Prospective Immigration of Samoan Children S.N. and H.N.

(1) On July 28, 2004, FOC referred S.N. and H.N. for adoption. However, the relinquishment of the children did not occur until August 5, 2004.

(2) Subsequently, S.N. and H.N. were placed in the FOC nanny home. Their older siblings, M.N.(1) and M.N.(2) were also placed in the nanny home, though no relinquishment had been executed for these two children. After S.N. and H.N. were relinquished, FOC representatives in Samoa frequently permitted all of the children to live with their birth parents on weekends. On other occasions, the birth parents visited their children at the nanny home. During such visits, the birth parents became concerned for the welfare of their children and observed that they were not eating as much, had sores on their bodies, and had clearly deteriorated since entering into FOC's care. Further, the older children reported to the birth parents that children at the nanny home were spanked and beaten with a broomstick when they asked for more food.

(3) On June 4, 2005, TAGALOA IETI returned S.N., H.N., M.N.(1) and M.N.(2) to their birth parents. H.N. was sick and looked pale. On June 5, 2005, the birth parents took H.N. to a hospital where medical officials determined that she was very malnourished, dehydrated, and had a chronic ulcer on her left foot which had not been treated. On June 7, 2005, H.N. died at the hospital.

(4) Following the death of H.N., SCOTT BANKS continued to falsely assert to the prospective adoptive family of S.N. that the birth family still wanted to give up the child for adoption. Subsequently, in August 2005, KAREN BANKS visited the birth family to ask if they wanted to go forward with the adoption of S.N., who was living with his birth parents at their home. They refused.

(G) The Adoption and Immigration of Samoan Child F.I.

(1) In December 2003, FOC referred F.I. for adoption. The prospective adoptive parent accepted the referral.

(2) KARALEE THORNOCK falsely told the adoptive parent that F.I. had been abandoned in a toilet and rescued by an unrelated couple. She also falsely told the adoptive parent that the family, who also had 8 other children and had taken care of F.I. for the past 3 years, could no longer afford to do so.

(3) In January 2004, KARALEE THORNOCK sent the prospective adoptive parent an email describing the process for the adoption of F.I. In that letter, KARALEE THORNOCK cautioned one of the adoptive parents that she should not be alarmed by mistakes in the affidavit that she would soon be required to sign. She told the adoptive parent that such mistakes "happen on every affidavit."

(4) A "Confirmation of Relinquishment" dated November 24, 2003 and an "Affidavit of Natural Parent" dated May 21, 2004, asserted that the adults who F.I. had been living with were her natural (birth) parents. When the prospective adoptive parent of F.I. discovered such, she confronted KARALEE THORNOCK who told her that FOC needed to make that claim on the documents, even though it was false, in order for the adoption to go through.

(5) In February 2005, COLEEN BARTLETT escorted F.I. to New Zealand for U.S. visa processing. On February 9, 2005, based on the false claim that F.I. was an orphan, an immigrant visa was issued. COLEEN BARTLETT then brought F.I. to the United States and delivered her to the adoptive parent.

(H) The Adoption and Immigration of Samoan Children F.N.(1), F.N.(2), and M.N.

(1) At some time in 2003, DAN WAKEFIELD approached the birth parents of F.N.(1), F.N.(2), and M.N. to persuade them to give their children to the program which DAN WAKEFIELD described as a Mormon Church program to educate Samoan children in the United States. DAN WAKEFIELD told them that the children would return at the age of 18 as well as every 5 or 6 years to visit and that the children would be dual citizens of Samoa and the United States.

(2) On February 2004, the birth parents signed a relinquishment for F.N.(2) which was written in English and not explained to them. Similar relinquishments were signed for F.N.(1) and M.N. in November 2004. All of these documents falsely stated that the birth parents could not take care of the children. Translated versions of the affidavits later submitted to the U.S. Consulate in New Zealand for F.N.(1) and M.N. contained signatures which were forgeries.

(3) From September 2003 to June 2005, DAN WAKEFIELD frequently gave the birth parents food and money. During this period of time, the children returned to stay with their birth parents multiple times.

(4) In May 2004, F.N.(2) was delivered to her adoptive parents. On May 17, 2004, an I-600, which falsely claimed that F.N.(2) was an orphan, was filed in New Zealand and approved that same day. F.N.(2) subsequently immigrated to the United States.

(5) On June 4, 2005, another child in the nanny home, H.N., died. On June 15, 2005, KAREN BANKS traveled to Samoa and, among other things, visited the birth parents of F.N.(1) and M.N. and told them that the children were safe and had been moved to a different location.

(7) Thereafter, KAREN BANKS told that adoptive parents of F.N.(1) and M.N. that they could not travel to Samoa to pick up the children. KAREN BANKS told them that this was due to bad press resulting from H.N.'s death. Further, KAREN BANKS and COLEEN BARTLETT told the adoptive family that they must not mention H.N.'s death to State Department officials in New Zealand and that they should be cautious with what they say because a particular consular officer was philosophically opposed to international adoptions.

(8) In June 2005, F.N.(1) and M.N. were delivered to their adoptive parents in New Zealand. On June 27, 2005, the adoptive parents filed I-600s, which falsely claimed that F.N.(1) and M.N. were orphans, which were approved on June 29, 2005. F.N.(1) and M.N. subsequently immigrated to the United States.

(9) In June 2005, F.N.(1) and M.N. were preparing to leave New Zealand for the United States with their adoptive parents but tried to

run away and find a plane to return them to Samoa.

All in violation of Title 18, United States Code, Section 371.

**COUNT 2**
**18 U.S.C. § 1956(h)**
**(Conspiracy to Commit Money Laundering)**

Beginning on or about a date unknown to the Grand Jury, but no later than January 2001 and continuing through November 2004, in the Central Division of the District of Utah and elsewhere,

FOCUS ON CHILDREN, SCOTT BANKS,
KAREN BANKS and DAN WAKEFIELD,

the defendants herein and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to launder monetary instruments by the knowing transportation, transmission, and transference of a monetary instrument and funds from a place within the United States, that is the State of Utah, to a place outside the United States, that is Samoa, with the intent to promote the carrying on of a specified unlawful activity, that is alien smuggling, (a violation of 8 U.S.C. §§ 1324(a)(1)(A)(iv) and (a)(2)) and visa fraud (a violation of 18 U.S.C. § 1546(a)), in violation of 18 U.S.C. § 1956(a)(2)(A), all in violation of Title 18, United States Code, Section 1956(h).

**OVERT ACTS**

During and in furtherance of the conspiracy, within the District of Utah and

elsewhere, FOCUS ON CHILDREN and SCOTT BANKS and KAREN BANKS did transport, transmit, and transfer from the United States to Samoa approximately $281,388 to DAN WAKEFIELD and approximately $119,896.24 to an attorney to facilitate alien smuggling and visa fraud, including the allegations set forth in Counts 111 - 135 of this Indictment as set forth herein.

**COUNTS 3 - 39**
**8 U.S.C. § 1324(a)(2); 18 U.S.C. § 2**
**(Bringing In Illegal Aliens to the United States; Aiding and Abetting)**

On or about the dates set forth below, within the Central Division of the District of Utah and elsewhere, the defendants set forth below, and others known and unknown to the Grand Jury, knowing and in reckless disregard of the fact that Samoan children set forth below whose full names are known to the Grand Jury, who are not citizens or nationals of the United States, had not received prior official authorization to come to, enter, and reside in the United States, did bring to and attempt to bring to the United States said aliens for the purpose of commercial advantage and private financial gain, and did aid and abet therein, all in violation of Title 8, United States Code, Section 1324(a)(2) and Title 18, United States Code, Section 2, and punishable pursuant to Title 8, United States Code, Section 1324(a)(2)(B)(ii).

| Count | Date | Defendant(s) | Initials of Samoan Child |
|---|---|---|---|
| | | | Sibling Group #1 |

| | | | |
|---|---|---|---|
| 3 | On or about August 20, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | E.F.(1) |
| 4 | On or about August 20, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | E.F.(2) |
| | | | Sibling Group #2 |
| 5 | On or about January 14, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | L.L.(1) |
| 6 | On or about March 17, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | L.L.(2) |
| | | | Sibling Group #3 |
| 7 | On or about June 6, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | J.T. |
| 8 | On or about November 4, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>COLEEN BARTLETT<br>TAGALOA IETI<br>KARALEE THORNOCK | S.T. |
| 9 | On or about August 25, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>COLEEN BARTLETT | W.T. |
| | | | Sibling Group #4 |
| 10 | On or about June 29, 2005 | SCOTT BANKS<br>DAN WAKEFIELD<br>KAREN BANKS<br>COLEEN BARTLETT | F.F.(1) |

| | | | |
|---|---|---|---|
| 11 | On or about June 29, 2005 | SCOTT BANKS<br>DAN WAKEFIELD<br>KAREN BANKS<br>COLEEN BARTLETT | M.F. |
| 12 | On or about May 17, 2004 | SCOTT BANKS<br>DAN WAKEFIELD | F.F.(2) |
| | | | Sibling Group #5 |
| 13 | On or about January 15, 2004 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | G.U. |
| 14 | On or about July 15, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | L.U. |
| | | | Sibling Group #6 |
| 15 | On or about November 12, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | S.T.S. |
| 16 | On or about November 12, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | T.S. |
| 17 | On or about November 12, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | K.S. |
| | | | Sibling Group #7 |
| 18 | On or about February 24, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD | K.K. |
| 19 | On or about February 24, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD | F.K. |
| | | | Sibling Group #8 |

| | | | |
|---|---|---|---|
| 20 | On or about August 21, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | L.I. |
| 21 | On or about August 21, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | T.I. |
| | | | Sibling Group #9 |
| 22 | On or about February 14, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | Si.S. |
| 23 | On or about February 14, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | M.S. |
| 24 | On or about January 22, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | T.S. |
| 25 | On or about December 10, 2002 | SCOTT BANKS<br>DAN WAKEFIELD | U.S. |
| 26 | On or about December 10, 2002 | SCOTT BANKS<br>DAN WAKEFIELD | N.S. |
| | | | Sibling Group #10 |
| 27 | On or about April 15, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | T.T. |
| 28 | On or about April 15, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | L.T. |
| | | | Sibling Group #11 |
| 29 | Beginning on or about a date unknown but no later than July 2004 and continuing to on or about June 4, 2005 | SCOTT BANKS<br>KAREN BANKS<br>COLEEN BARTLETT<br>TAGALOA IETI | H.N. |

| | | | |
|---|---|---|---|
| 30 | Beginning on or about a date unknown but no later than July 2004 and continuing to in or about August 2005 | SCOTT BANKS<br>KAREN BANKS<br>COLEEN BARTLETT<br>TAGALOA IETI | S.N. |
| | | | Sibling Group #12 |
| 31 | On or about September 4, 2003 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | L.S.(1) |
| 32 | On or about September 4, 2003 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | L.S.(2) |
| | | | Unrelated Children |
| 33 | On or about January 21, 2004 | SCOTT BANKS<br>DAN WAKEFIELD<br>COLEEN BARTLETT | A.L. |
| 34 | On or about February 2, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | S.S. |
| 35 | On or about January 22, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | G.T. |
| 36 | On or about July 20, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>KARALEE THORNOCK | Ta.S. |

| | | | |
|---|---|---|---|
| 37 | Beginning in or about June 2003 and continuing to on or about February 6, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | P.F. |
| 38 | On or about January 28, 2004 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>KARALEE THORNOCK<br>COLEEN BARTLETT | U.F. |
| 39 | On or about February 9, 2005 | SCOTT BANKS<br>COLEEN BARTLETT<br>KARALEE THORNOCK | F.I. |

**COUNTS 40 - 76**
**8 U.S.C. §§ 1324(a)(1)(A)(iv), (v)(II)**
**(Encouraging or Inducing Illegal Aliens to Come to, Enter, or Reside in the United States; Aiding and Abetting)**

On or about the dates set forth below, within the Central Division of the District of Utah and elsewhere, the defendants set forth below, and others known and unknown to the Grand Jury, did encourage and induce the Samoan children set forth below whose full names are known to the Grand Jury , who are not citizens or nationals of the United States, to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the United States was and would be in violation of law, for the purpose of commercial advantage and private financial gain, and did aid and abet therein; all in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv) and (a)(1)(A)(v)(II) and punishable pursuant to Title 8, United States Code, Section

1324(a)(1)(B)(i).

| Count | Date | Defendant(s) | Initials of Samoan Child |
|---|---|---|---|
| | | | Sibling Group #1 |
| 40 | Beginning in or about March 2002 and continuing to on or about August 20, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | E.F.(1) |
| 41 | Beginning in or about March 2002 and continuing to on or about August 20, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | E.F.(2) |
| | | | Sibling Group #2 |
| 42 | Beginning on or about a date unknown but no later than June 5, 2002, to on or about January 14, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | L.L.(1) |
| 43 | Beginning on or about a date unknown but no later than June 5, 2002, to on or about March 17, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | L.L.(2) |
| | | | Sibling Group #3 |
| 44 | Beginning in or about September 2002 and continuing to on or about June 6, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | J.T. |
| 45 | Beginning in or about September 2002 and continuing to on or about November 4, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>COLEEN BARTLETT<br>TAGALOA IETI<br>KARALEE THORNOCK | S.T. |

| | | | |
|---|---|---|---|
| 46 | Beginning in or about September 2002 and continuing to on or about August 25, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>COLEEN BARTLETT | W.T. |
| | | | <u>Sibling Group #4</u> |
| 47 | Beginning on or about a date unknown but no later than September 2003 and continuing to on or about June 29, 2005 | SCOTT BANKS<br>DAN WAKEFIELD<br>KAREN BANKS<br>COLEEN BARTLETT | F.F. |
| 48 | Beginning on or about a date unknown but no later than September 2003 and continuing to on or about June 29, 2005 | SCOTT BANKS<br>DAN WAKEFIELD<br>KAREN BANKS<br>COLEEN BARTLETT | M.F. |
| 49 | Beginning on or about a date unknown but no later than November 2003 and continuing to on or about May 17, 2004 | SCOTT BANKS<br>DAN WAKEFIELD | F.F.(2) |
| | | | <u>Sibling Group #5</u> |
| 50 | Beginning on or about a date unknown but no later than October 2003 and continuing to on or about January 15, 2004 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | G.U. |
| 51 | Beginning on or about a date unknown but no later than February 2003 and continuing to on or about July 15, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | L.U. |

| | | | |
|---|---|---|---|
| | | | Sibling Group #6 |
| 52 | Beginning on or about a date unknown but no later than July 2003 and continuing to on or about November 12, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | S.T.S. |
| 53 | Beginning on or about a date unknown but no later than July 2003 and continuing to on or about November 12, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | T.S. |
| 54 | Beginning on or about a date unknown but no later than July 2003 and continuing to on or about November 12, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | K.S. |
| | | | Sibling Group #7 |
| 55 | Beginning on or about a date unknown but no later than May 2003 and continuing to on or about February 24, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD | K.K. |
| 56 | Beginning on or about a date unknown but no later than May 2003 and continuing to on or about February 24, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD | F.K. |
| | | | Sibling Group #8 |

| | | | |
|---|---|---|---|
| 57 | Beginning on or about a date unknown but no later than April 2002 and continuing to on or about August 21, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | L.I. |
| 58 | Beginning on or about a date unknown but no later than April 2002 and continuing to on or about August 21, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | T.I. |
| | | | Sibling Group #9 |
| 59 | Beginning on or about a date unknown but no later than April 2002 and continuing to on or about February 14, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | Si.S. |
| 60 | Beginning on or about a date unknown but no later than April 2002 and continuing to on or about February 14, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | M.S. |
| 61 | Beginning in or about March 2002 and continuing to on or about January 22, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | T.S. |
| 62 | Beginning in or about March 2002 and continuing to on or about December 10, 2002 | SCOTT BANKS<br>DAN WAKEFIELD | U.S. |

| | | | |
|---|---|---|---|
| 63 | Beginning in or about March 2002 and continuing to on or about December 10, 2002 | SCOTT BANKS<br>DAN WAKEFIELD | N.S. |
| | | | Sibling Group #10 |
| 64 | Beginning in or about August 2002 and continuing to on or about April 15, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | T.T. |
| 65 | Beginning in or about August 2002 and continuing to on or about April 15, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | L.T. |
| | | | Sibling Group #11 |
| 66 | Beginning on or about a date unknown but no later than July 2004 and continuing to on or about June 4, 2005 | SCOTT BANKS<br>KAREN BANKS<br>COLEEN BARTLETT<br>TAGALOA IETI | H.N. |
| 67 | Beginning on or about a date unknown but no later than July 2004 and continuing to in or about August 2005 | SCOTT BANKS<br>KAREN BANKS<br>COLEEN BARTLETT<br>TAGALOA IETI | S.N. |
| | | | Sibling Group #12 |
| 68 | Beginning on or about a date unknown but no later than June 2003 and continuing to on or about September 4, 2003 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | L.S.(1) |

| | | | |
|---|---|---|---|
| 69 | Beginning on or about a date unknown but no later than June 2003 and continuing to on or about September 4, 2003 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | L.S.(2) |
| | | | Unrelated Children |
| 70 | Beginning on or about a date unknown but no later than October 2003 and continuing to on or about January 21, 2004 | SCOTT BANKS<br>DAN WAKEFIELD<br>COLEEN BARTLETT | A.L. |
| 71 | Beginning in or about February 2003 and continuing to on or about February 2, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | S.S. |
| 72 | Beginning in or about August 2002 and continuing to on or about January 22, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | G.T. |
| 73 | Beginning on or about a date unknown but no later than September 2003 and continuing to on or about July 20, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>KARALEE THORNOCK | Ta.S. |
| 74 | Beginning in or about June 2003 and continuing to on or about February 6, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | P.F. |

| | | | |
|---|---|---|---|
| 75 | Beginning in or about May 2003 and continuing to on or about January 28, 2004 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>KARALEE THORNOCK<br>COLEEN BARTLETT | U.F. |
| 76 | Beginning on or about a date unknown but no later than November 2003 and continuing to on or about February 9, 2005 | SCOTT BANKS<br>COLEEN BARTLETT<br>KARALEE THORNOCK | F.I. |

**COUNTS 77 - 110**
**18 U.S.C. §§ 1546(a), 2**
**(Fraud and Misuse of Visas; Aiding and Abetting)**

On or about the dates set forth below, within the Central Division of the District of Utah and elsewhere, the defendants set forth below, and others known and unknown to the Grand Jury, did knowingly cause others to make under oath and under penalty of perjury, subscribe as true, and present an application containing a false and fraudulent statement with respect to a material fact on United States Citizenship and Immigration Services Form I-600 (Petition to Classify Orphan as an Immediate Relative) for the purpose of permitting another to come to, enter, and reside in the United States as an orphan child of a United States citizen, in that in such petition the defendants caused to be stated that the children listed in such applications and set forth below whose full names are known to the Grand Jury were bona fide orphans when, in truth and fact, such was not true, and did aid and abet therein, all in violation of Title 18, United States

Code, Section 1546(a) and 2.

| Count | Date (On or about) | Defendant(s) | Initials of Samoan Child |
|---|---|---|---|
| | | | Sibling Group #1 |
| 77 | August 20, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | E.F.(1) |
| 78 | August 20, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | E.F.(2) |
| | | | Sibling Group #2 |
| 79 | January 14, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | L.L.(1) |
| 80 | March 17, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | L.L.(2) |
| | | | Sibling Group #3 |
| 81 | June 6, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | J.T. |
| 82 | November 4, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>COLEEN BARTLETT<br>TAGALOA IETI<br>KARALEE THORNOCK | S.T. |
| 83 | August 25, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>COLEEN BARTLETT | W.T. |
| | | | Sibling Group #4 |

| | | | |
|---|---|---|---|
| 84 | June 29, 2005 | SCOTT BANKS<br>DAN WAKEFIELD<br>KAREN BANKS<br>COLEEN BARTLETT | F.F.(1) |
| 85 | June 29, 2005 | SCOTT BANKS<br>DAN WAKEFIELD<br>KAREN BANKS<br>COLEEN BARTLETT | M.F. |
| 86 | May 17, 2004 | SCOTT BANKS<br>DAN WAKEFIELD | F.F.(2) |
| | | | Sibling Group #5 |
| 87 | January 15, 2004 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | G.U. |
| 88 | July 15, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | L.U. |
| | | | Sibling Group #6 |
| 89 | November 12, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | S.T.S. |
| 90 | November 12, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | T.S. |
| 91 | November 12, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | K.S. |
| | | | Sibling Group #7 |
| 92 | February 24, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD | K.K. |

| | | | |
|---|---|---|---|
| 93 | February 24, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD | F.K. |
| | | | Sibling Group #8 |
| 94 | August 21, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | L.I. |
| 95 | August 21, 2002 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI | T.I. |
| | | | Sibling Group #9 |
| 96 | February 14, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | Si.S. |
| 97 | February 14, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | M.S. |
| 98 | January 22, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | T.S. |
| 99 | December 10, 2002 | SCOTT BANKS<br>DAN WAKEFIELD | U.S. |
| 100 | December 10, 2002 | SCOTT BANKS<br>DAN WAKEFIELD | N.S. |
| | | | Sibling Group #10 |
| 101 | April 15, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | T.T. |
| 102 | April 15, 2003 | SCOTT BANKS<br>DAN WAKEFIELD | L.T. |
| | | | Sibling Group #11 |

| | | | |
|---|---|---|---|
| 103 | September 4, 2003 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | L.S.(1) |
| 104 | September 4, 2003 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | L.S.(2) |
| | | | Unrelated Children |
| 105 | January 21, 2004 | SCOTT BANKS<br>DAN WAKEFIELD<br>COLEEN BARTLETT | A.L. |
| 106 | February 2, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>COLEEN BARTLETT | S.S. |
| 107 | January 22, 2003 | SCOTT BANKS<br>DAN WAKEFIELD<br>JULIE TUILETUFUGA | G.T. |
| 108 | July 20, 2004 | SCOTT BANKS<br>KAREN BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>KARALEE THORNOCK | Ta.S. |
| 109 | January 28, 2004 | SCOTT BANKS<br>DAN WAKEFIELD<br>TAGALOA IETI<br>KARALEE THORNOCK<br>COLEEN BARTLETT | U.F. |

| | | | |
|---|---|---|---|
| 110 | February 9, 2005 | SCOTT BANKS<br>COLEEN BARTLETT<br>KARALEE THORNOCK | F.I. |

**COUNTS 111 - 129**
**18 U.S.C. §§ 1956(a)(2)(A), 2**
**(Laundering of Monetary Instruments; Aiding and Abetting)**

On or about the dates set forth below, in the Central Division of the District of Utah and elsewhere,

FOCUS ON CHILDREN, SCOTT BANKS,
KAREN BANKS and DAN WAKEFIELD,

the defendants herein, did, as set forth below, knowingly transport, transmit, and transfer monetary instruments and funds from a place within the United States, that is the State of Utah, to a place outside the United States, that is Samoa, with the intent to promote the carrying on of a specified unlawful activity that is, alien smuggling (a violation of 8 U.S.C. §§ 1324(a)(1)(A)(iv) and (a)(2)) and visa fraud (a violation of 18 U.S.C. § 1546(a)), and did aid and abet therein, all in violation of Title 18, United States Code, Section 1956(a)(2)(A) and 2.

| Count | Date (On or about) | Sender | Recipient | Amount |
|---|---|---|---|---|
| 111 | August 28, 2002 | FOC | Dan Wakefield | $8,000 |
| 112 | June 10, 2003 | FOC | Dan Wakefield | $4,000 |
| 113 | July 16, 2003 | FOC | Dan Wakefield | $5,300 |
| 114 | August 25, 2003 | FOC | Dan Wakefield | $5,000 |
| 115 | September 30, 2003 | FOC | Dan Wakefield | $6,000 |

| | | | | |
|---|---|---|---|---|
| 116 | October 8, 2003 | FOC | Dan Wakefield | $5,200 |
| 117 | November 5, 2003 | FOC | Dan Wakefield | $9,250 |
| 118 | December 19, 2003 | FOC | Dan Wakefield | $4,000 |
| 119 | January 23, 2004 | FOC | Dan Wakefield | $3,000 |
| 120 | February 17, 2004 | FOC | Dan Wakefield | $7,120 |
| 121 | March 11, 2004 | FOC | Dan Wakefield | $2,750 |
| 122 | April 16, 2004 | FOC | Dan Wakefield | $2,750 |
| 123 | May 10, 2004 | FOC | Dan Wakefield | $5,500 |
| 124 | June 21, 2004 | FOC | Dan Wakefield | $4,700 |
| 125 | July 7, 2004 | FOC | Dan Wakefield | $7,825 |
| 126 | August 11, 2004 | FOC | Dan Wakefield | $2,750 |
| 127 | September 15, 2004 | FOC | Dan Wakefield | $1,750 |
| 128 | October 19, 2004 | FOC | Dan Wakefield | $1,750 |
| 129 | November 29, 2004 | FOC | Dan Wakefield | $7,000 |

**COUNTS 130 - 135**
**18 U.S.C. §§ 1957(a); 2**
**(Monetary Transactions in Property Derived from Specified Unlawful Activity; Aiding and Abetting)**

On or about the dates set forth below, in the Central Division of the District of Utah and elsewhere,

FOCUS ON CHILDREN, SCOTT BANKS,
KAREN BANKS and DAN WAKEFIELD

the defendants herein, did, as set forth below, knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value

greater than $10,000, such property having been derived from a specified unlawful activity, that is, alien smuggling (a violation of 8 U.S.C. §§ 1324(a)(1)(A)(iv) and (a)(2)) and visa fraud, (a violation of 18 U.S.C. § 1546(a)), and did aid and abet therein, all in violation of Title 18, United States Code, Section 1957(a) and 2.

| Count | Date (On or about) | Amount | Deposit Account Number |
|---|---|---|---|
| 130 | November 13, 2001 | $11,458 | Zions *****3642 |
| 131 | November 5, 2003 | $17,500 | Wells Fargo ******1310 |
| 132 | December 30, 2003 | $12,700 | Wells Fargo ******1310 |
| 133 | February 17, 2004 | $11,720 | Wells Fargo ******1310 |
| 134 | August 3, 2004 | $11,100 | Wells Fargo ******1310 |
| 135 | February 7, 2005 | $10,500 | Wells Fargo ******1310 |

## NOTICE OF INTENT TO SEEK FORFEITURE

As a result of committing the felony offenses alleged in Count 1 (Conspiracy to Commit Alien Smuggling and Visa Fraud), Count 2 (Conspiracy to Commit Money Laundering), Counts 3 - 76 (Alien Smuggling), and Counts 111-135 (Money Laundering) of this Indictment, which is punishable by imprisonment for more than one year, the defendants shall forfeit to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) and (6), 8 U.S.C. § 1324(b) and 28 U.S.C. § 2461, any and all property constituting or derived from any proceeds the said defendants obtained directly or indirectly as a result of the said felony offenses and any and all property,

real and personal, involved in or used or intended to be used in any manner or part to commit and to facilitate the commission of the violations of 18 U.S.C. § 371 (Conspiracy to Commit Alien Smuggling under 8 U.S.C. § 1324), 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering), 8 U.S.C. §§ 1324(a)(1)(A)(iv), (a)(2) (Alien Smuggling), and 18 U.S.C. §§ 1956(a)(2)(A) and 1957 (Money Laundering).

If any of the qualified forfeitable property, as a result of any act or omission of the defendants, (1) cannot be located upon the exercise of due diligence, (2) has been transferred or sold to, or deposited with, a third person, (3) has been placed beyond the jurisdiction of the court, (4) has been substantially diminished in value or (5) has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendants up to the value of the qualified forfeitable property.

A TRUE BILL:

Thornton K. Haymnth

FOREPERSON OF THE GRAND JURY

BRETT L. TOLMAN
UNITED STATES ATTORNEY

DUSTIN B. PEAD
BARBARA BEARNSON
Assistant United States Attorneys