BRETT L. TOLMAN, United States Attorney (#8821)
BARBARA BEARNSON, Assistant United States Attorney (#3986)
BRETT R. PARKINSON, Assistant United States Attorney (#10310)
Attorneys for the United States of America
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Facsimile: (801) 524-6924

---

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, NORTHERN DIVISION

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FOCUS ON CHILDREN, et al.,<br><br>Defendants. | :<br>:<br>:<br>: | Case No. 1:07-CR-19 DS<br><br>**SENTENCING MEMORANDUM**<br><br>Judge David Sam |

---

The undersigned Assistant United States Attorney submits the following Sentencing Memorandum to assist the Court at the time of sentencing.

On February 28, 2007, the defendants, collectively, were charged in an indictment for their conduct related to a fraudulent adoption scheme. At its core, the indictment alleged that Defendants improperly facilitated the adoption of children from Samoa to the United States. The defendants, on January 6, 2009, took responsibility for their respective

roles in improperly facilitating the adoption scheme and pleaded guilty to Misdemeanor Informations. This plea negotiation, generally speaking, resulted in the reduction of charges with an agreement by the United States to recommend that the defendants be sentenced to a five-year term of probation.

The defendants agreed to the following:

- Plead guilty to Misdemeanor Informations,
- Waive their rights to appeal and collaterally attack their sentence,
- Not participate in the adoption business, either domestic or international, for five (5) years,
- To contribute to a trust established for the benefit of the adopted children,
- Defendants Scott and Karen Banks will participate, speaking through their attorneys, in a press conference following their sentencing to provide information to the public and others in the adoption field in an effort to prevent future adoption fraud,
- Defendants Scott and Karen Banks will forfeit their right to business and adoption records; these records will, as appropriate, be used to provide additional information to adoptive parents and facilitate the exchange of information,

- Defendants Scott and Karen Banks agreed to cooperate, and will continue to cooperate, with the Untied States by disclosing their adoption practices in Samoa, Russia, Vietnam, and Guatemala to officials with the Department of State.

This result was achieved through months of negotiation, effort, and thought on the part of the United States. The United States believes that this agreement is the most meaningful solution to addressing the most serious harm in this case. In this regard, it believes that the best interests of the children (and finding a way to achieve that interest) trumps the concept of punishment alone. Indeed, it was incumbent on the Untied States to balance the desire for punishing the defendants' criminal conduct with need to provide security and stability to the victims.

In short, the United States had three goals at the outset of this investigation and prosecution: (1) stop the defendants from continuing their criminal behavior (specific deterrence); (2) end, to the extent possible, the rampant fraud taking place in intercountry adoptions between the United States and Samoa (general deterrence); and (3) punish the defendants for their criminal conduct. The resolution reached between the parties, although somewhat unconventional, satisfies these three (3) goals.

**Federal Sentencing Law**

The defendants pleaded guilty to Aiding and Abetting the Improper Entry of an

Alien. In determining an appropriate sentence, the law requires the Court to consider the sentencing factors articulated in 18 U.S.C. § 3553(a). Consideration of these factors helps sentencing courts achieve a sentence that is "sufficient but not greater than necessary to comply with the purposes.". 18 U.S.C. § 3553(a). The factors referenced in § 3553(a)(1), which the court is to weigh, include the nature and circumstances of the offense and characteristics of the offenders, and the history and characteristics of the defendants. The statute also requires, in subsection§ 3553(a)(2), that the Court examine other factors in an effort to arrive at the most appropriate sentence, including (a) the seriousness of the offense, promoting respect for the law, providing just punishment, (b) affording adequate deterrence, (c) protecting the public from further crimes by the defendants, (d) providing the defendants with effective rehabilitative measures. The remaining two § 3553(a) factors, deterrence and protection of the public, have been overarching goals of this prosecution from the beginning.[1]

The United States, has weighed these considerations–*and many more*–in reaching an agreement with the defendants in this case. The plea negotiation between the parties, and the sentence the United States is recommending to this Court, satisfies each of these

[1]The statute also requires courts to consider the applicable Sentencing Guideline range in the particular case; given the class B category of offense in this case, however, this provision of the statute does not apply.

§ 3553(a) factors. While the United States does not seek to minimize the overwhelming and lasting effects of the defendants' conduct, it also recognizes that there are differing views on the nature and circumstances of the offenses and the characteristics of the defendants. In addition, as set forth more fully below, the United States recognizes that there are reasons to seek restorative justice in this case, rather than the maximum possible prison term.

**Victim's Interests**

In addition to taking into account the traditional considerations attendant to a criminal case, it was imperative that the United States consider the views of those affected by the defendants' actions, particularly the children. Because of the tremendous impact this case has on the victims (adopted children, adoptive parents, and birth parents), we made significant efforts to communicate with them to ensure that our efforts were consistent, to the extent they could be, with theirs. This involved a tremendous effort on the part of the United States. Prosecutors called and emailed adoptive parents throughout the United States to discuss the potential resolution. In addition, prosecutors also traveled to Samoa, along with agents from the Diplomatic Security Service ("DSS"), for the specific purpose of meeting with birth families to discuss the potential resolution of the case. These efforts were enlightening. The perspective and desires of the victims, although not in complete agreement, provided insight on the ultimate resolution.

Adoptive Parents

There are dozens of adoptive parents who were impacted in significant but different ways by this case. In reaching out to adoptive parents, the United States confirmed that some adoptive parents wanted the defendants to go to prison for a long time, while others had no interest in seeing the defendants incarcerated. Once punitive issues were put aside, they each discussed other factors that impacted their individual family and the hopes they had in what a resolution might bring to their situation. Although these interests were diverse, two common themes arose: (1) security of the current family unit,[2] and (2) recognition by the defendants that they caused harm to families involved.

During these discussions, the United States presented the idea of creating a trust into which the defendants would be required to pay as a means of providing assistance to the families, and as a penalty for their criminal conduct. Because the greatest concern to adoptive parents was keeping the adoptive family unit stable, the United States proposed that trust funds be used to facilitate communication between adoptive parents and birth

[2] Each family had a different idea as to what might help. Some indicated counseling services would be helpful, others stated that they would like to be able to take their child back to Samoa to connect with their heritage and birth family, and still others wanted to be able to connect with adoptive siblings in the United States. It should be noted, however, that the gravest concern expressed by the adoptive parents was that somehow a trial would result in the birth families or the government taking their children from them. This was especially significant for many families who have raised their adopted children in the United States since infancy.

families.[3] Following is a sampling of the responses:

| Positive | Negative |
|---|---|
| "It should be good." | "Not happy with the resolution at all." |
| "Sounds wonderful" | Want the defendants to go to jail. |
| "Good, creative idea." | |
| "Great idea." | |
| "No revenge is necessary." | |
| "Sounds really good." | |
| "Awesome." | |

The majority of the complaints the United States received in regards to the resolution was not that it did not provide adequate punishment but rather that it did not go far enough in providing resources that adoptive families could draw upon to aid the healing process. The United States agrees with these concerns, but is also cognizant of the fact that the defendants do not collectively have the vast resources needed to begin to solve all the issues created by their wrongdoing.

---

[3] During visits to Samoa, prosecutors and agents have found that for many birth parents, the more information they have about their children, and the more they know that their children are safe and thriving in loving homes, the less concern they have about their children's placement with adoptive parents.

Birth Parents

In December 2008, the undersigned AUSA, AUSA Barbara Bearnson, and two DSS agents went to Samoa to meet with birth parents about the proposed resolution to the case, and to listen to their interests and concerns. As was done in prior visits to Samoa, the attorneys and agents delivered letters and photographs from several adoptive parents. We met with approximately twenty-five (25) families.

The interests of the Samoan birth families was quite consistent; their primary concern was the well-being of their child(ren).[4] To this end, each birth parent hoped for continued contact with their children but due to economic conditions, many of them did not have a mechanism to even receive mail, let alone email. We presented the proposed resolution (the establishment of a trust to facilitate communication) and explained how each of them would receive a post office box to receive letters and/or photographs to the extent that adoptive parents wished to open up their adoption.[5] Each of the birth families appreciated this idea and was eager for the continued contact.

---

[4]Although the overarching concern was the children's welfare, a couple of families were still troubled with the fact that their child was taken from them, and expressed their desire to have their child back.

[5]In addition, a victim services organization, the Samoa Victim Support Group ("SVSG"), also expressed a willingness to assist in this process. It is anticipated at this time that SVSG will receive emails (letters/photographs) from participating adoptive families, print out those emails, translate them, and deliver them to birth families.

Interestingly, not one of the birth parents wanted the defendants to go to prison, and many of them indicated that they had forgiven the defendants. The birth parents, however, desired to know how their children were doing; they want to be part of their child's life, even if that is only through the mail.

**The Resolution**

Knowing the allegations in the Indictment and the hurt caused to so many innocent people, including children, the government understands some might second-guess the United States' plea offer in this case. The victims in this case have suffered more than any person or family should have to endure. One's first instinct is that the people responsible for causing such pain should, at a minimum, be sent to prison. However, there are times when justice requires the government to shed these punitive instincts. This is one of those occasions.

After speaking with both adoptive parents and birth families, the United States was confident that justice would not be best served by going to trial in order to achieve a significant prison term for the defendants.[6] If the United States pursued a trial and was

---

[6]Notably, due to the fact that each Defendant was charged with crimes that carry mandatory minimum terms of imprisonment, if the government prevailed on just one count, it was possible that each Defendant would serve at least three (3) years in prison.

successful, it was not likely, given the unique circumstances of this case,[7] that it would be able to persuade the Court that, in addition to the significant term of imprisonment that it was required to impose, it should also establish a trust for the purposes mentioned above. The question left for the United States was whether justice would be better served if the defendants accepted responsibility for their action, received probation, and were punished by paying into a trust, **<u>or</u>** whether the United States should risk going to trial in an effort to ensure that the defendants went to prison. Justice required erring on the side that would bring assistance to the victims.

<u>The Plea Negotiation</u>

The defendants accepted the plea offer described above. They also accepted responsibility for their wrongdoing. Indeed, the factual basis for the plea agreements is not only sufficient to find the defendants guilty of the misdemeanor offenses for which they were ultimately convicted, it is also sufficient for the felony counts for which they were charged. That is significant in this case because the criminal nature of the conduct is not minimized by virtue of the plea agreement. The label given to such conduct, however, is changed.

---

[7]The financial investigation in this case failed to reveal assets that were worthy of forfeiture or money that could be converted for this purpose. Had the facts been different with respect to the defendants' financial wherewithal, so too would have been the plea offer.

The Trust

The trust to which the defendants will contribute as part of their sentence is established for one primary purpose–to facilitate communication between the adoptive families and birth parents. From the United States' communication with these parties, this has a meaningful impact and, indeed, is the most important factor it considered in reaching the agreement in this case. Adoptive parents are concerned that this case may in some way disrupt their family,[8] while birth parents long for an update regarding their children's well-being. By making communication between adoptive parents and birth families possible, both interests are substantially fulfilled.

In order to make this resolution work, however, the defendants must make substantial contributions to this trust. This is true for two reasons. First, this is the penalty for the defendants conduct and the contribution on the defendants' part must be burdensome. Second, to facilitate overseas communication to a country, for at least the next five (5) years, costs money, especially without the technology enjoyed in the United States.

[8]Many adoptive parents express a fear that either the United States government or the Samoan birth parents would take action to return the children to Samoa. The United States Attorneys Office, District of Utah, as well as the respective agencies assigned to this case have repeatedly assured adoptive parents that the government has no interest in disrupting the status quo of their family. That said, some fears were not assuaged as there always lurked a possibility that a Samoan birth family would seek to undue an adoption.

Comparison to Other Adoption Fraud Cases

In an effort to appreciate the resolution in this case, it is important for the Court to look at other cases prosecuted for similar offenses. *See* 18 U.S.C. § 3553(a)(6) (explaining that sentencing courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The only other adoption fraud case presented by the United States was *United States v. Galindo*, No. CR03-0187Z (W.D. Wash. 2003). The *Galindo* case involved two individual defendants who operated an inter-country adoption business based in Seattle, Washington, which focused on adopting children from Cambodia to the United States. According to public documents, Galindo and her co-defendant "operated a scheme to defraud U.S. citizens who adopted some 700 children from Cambodia."[9] U.S. Immigration and Customs Enforcement, *Backgrounder, Operation Broken Hearts* (Nov. 19, 2004) (hereinafter *Backgrounder*). This conspiracy involved several federal offenses including alien smuggling, visa fraud, wire fraud, mail fraud, tax fraud, money laundering, and violations of the Foreign Corrupt Practices Act. *Id.* The defendants made approximately $8 million dollars in revenue for their scheme and lived lavish lifestyles as evidenced by the 1.4 million dollar Hawaiian home that was ultimately

[9]Ms. Galindo ultimately took responsibility for eighteen (18) fraudulent adoptions, but this fact alone does not change the reality that hundreds of children were brought to this country via Ms. Galindo and her adoption scheme.

forfeited in the case. *Backgrounder*, *and* www.cambodiaadoptionconnection.com/archived_updates.htm. What made the *Galindo* case particularly egregious was the fact that once the Cambodian children were taken from their birth parents, they were given new identities, rendering the children virtually untraceable.[10] David M. Smolin, *Child Laundering: How the Intercountry Adoption System Legitimizes and Incentivizes the Practices of Buying, Trafficking, Kidnapping, and Stealing Children*, 138 Wayne L. Rev.111, 136 (2005) (internal citations omitted).

Both of the defendants in the *Galindo* case ultimately pled guilty. Because of her cooperation in the case, Galindo's co-defendant (Lynn Devin) received a reduced sentence of six (6) months home confinement and a fine of $30,000. www.cambodiaadoptionconnection.com/archived_updates.htm. Galindo, on the other hand, the organizer of the scheme, was sentenced to eighteen (18) months incarceration, to be followed by thirty-six months of supervised release. *Id.* Galindo also had to forfeit her home, as mentioned above, and her $25,000 Jaguar luxury sedan. *Id.*

In comparing this case to *Galindo*, to the extent that such a comparison is possible, the resolution in this case is reasonable as it takes meaningful steps to remedy the wrong caused by the defendants.

[10]This fact alone renders it almost impossible to compare the two cases and their respective resolutions as it appears difficult in the *Galindo* case to reconnect adopted children with their birth parents.

## Justice

How does this resolution meet the three (3) prosecutorial objectives outlined at the beginning of this memorandum?

Specific Deterrence

Since this case began, not only have the defendants abandoned their adoption practice in Samoa, but they have stopped working in the adoption business altogether. In addition, as part of the plea agreement, the defendants have agreed not to participate in the adoption business in Samoa or in any other country for the next five (5) years. In light of the investigation and prosecution of this case, it is fair to say that many Samoan children and families have been saved the heartache endured by the victims of this case.

General Deterrence

Claims of malfeasance in the intercountry adoption business are rampant. The rarity, unfortunately, is a criminal prosecution for those criminal mis-deeds. The factual basis for the plea in this case should send a clear message to the broader intercountry adoption community in the United States. Indeed, the defendants admitted that they were reckless in the oversight of their business and allowed children to be adopted who were not properly orphaned. International adoption agencies cannot ignore what goes on in the foreign country where they do business, and now, more than ever, it is clear that they must take an active role in ensuring that the rights of children and birth parents are

protected. This resolution sends the clear message that a failure to do so will result in criminal prosecution. No longer can adoption agencies take a "hear-no-evil, see-no-evil" approach to overseas activities and they can and will be held responsible.

In addition, due in part to the investigation and prosecution of this case, it is fair to say that additional scrutiny is put on adoptions in Samoa by both the Samoan government and the United States Embassy. This type of crime should not happen in Samoa again.

Punishment

As the defendants operated their adoption business for profit, a financial punishment is in order. Unlike the defendant in *Galindo*, however, the defendants do not have forfeitable property, let alone a 1.4 million dollar Hawaiian home. That said, there should be a financial punishment which is proportional to their collective assets and income.

**Conclusion**

Because two of the three goals of this prosecution were achieved by investigating the case and filing an indictment, the final goal of punishment, is best meted out for this case through contribution to the trust created pursuant to Court order at the time of

///

///

///

sentencing. The United States will recommend, at the time of sentencing, the amount it deems reasonable for each Defendant to contribute under the circumstances.

Respectfully submitted this 24th day of February 2009.

BRETT L. TOLMAN
United States Attorney

/s/Brett Parkinson

BRETT PARKINSON
Assistant United States Attorney